# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                    CRIMINAL No. 15-346 (FAB)

JOSÉ CENTENO GONZÁLEZ,

     Defendant.

## REPORT AND RECOMMENDATION

### PROCEDURAL BACKGROUND

On August 6, 2015, a federal grand jury issued a three-count indictment against defendant José Centeno González ("Centeno" or "defendant"), charging him with possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). On September 3, 2015, Centeno filed a motion to suppress all physical evidence, testimonial evidence, and statements attributed to him resulting from a stop of a Toyota Tundra vehicle on May 6, 2015. ECF No. 39. The government responded on September 21, 2015. ECF No. 44. A hearing was held on November 10th and 13th, 2015. The government called Juncos Municipal Police Department ("JMPD") Agent Maria Sanabria Sanabria ("Agent Sanabria"), JMPD Agent Nilka Figueroa ("Agent Figueroa"), JMPD Agent Luis Rosa González ("Agent González"), Puerto Rico Police Department ("PRPD") Agent Carlos Calderón ("Agent Calderón"), PRPD Inspector Gerardo Oliver Franco ("Inspector Oliver"), and PRPD Agent Jorge Feliciano ("Agent Feliciano"). The defendant called PRPD Agent Francisco Cortés ("Agent Cortés") and investigator Shirley

Montilla Vélez ("Montilla"). For the following reasons, it is respectfully recommended that Centeno's motion to suppress be granted in part and denied in part.

### FINDINGS OF FACT

On May 6, 2015 JMPD Agent Sanabria, the duty agent that night, received two anonymous calls that ultimately led to the stop of a vehicle and arrest of its occupant. Around 6:40 or 6:45 pm Agent Sanabria received a call ("first call") from an unidentified female ("first caller"). According to the first caller, while she was entering her home at Tite Curet Street in Urbanization Estancias de la Ceiba in Juncos, she noticed something odd at a house farther up the street. She said she saw two vehicles: a white Toyota Tundra with tinted windows and a grey vehicle. She indicated that she saw a man get out of the Tundra and deliver weapons to the grey vehicle. The first caller then reported that the grey vehicle moved farther down the street, and two individuals got out. Then, she said, the two began shooting at an individual in the residence.[1] Over the phone, Agent Sanabria heard multiple detonations from a firearm. At that point, Agent Sanabria told the first caller to get away from the windows, and the caller disconnected. While still on the phone with the first caller, Agent Sanabria reported the details of the call over the radio to the JMPD Agents who were on the street.[2] Agent Figueroa received this radio transmission. She and her partner, Agent Rosa, were in the town of Juncos and proceeded towards Estancias de la Ceiba. Agent Sanabria then received a second call ("second call") from an unidentified female ("second caller"). The two callers were not the same person, according to Agent Sanabria, because the two voices sounded different. The second caller requested an

---

[1] Agent Sanabria's testimony was inconsistent as to whether the individuals entered the house or the car port; however, the distinction inconsequential to the merits of the pending motion to suppress evidence.

[2] There was some confusion in the testimonies regarding when and how many reports were made. This confusion appears to be a result of referring to the communications as "calls" when, rather, the communications were essentially being simulcast over the police radio. Regardless, as all communications transmitting the anonymous information were made before any intervention with the vehicle, these discrepancies are not of concern.

ambulance as one person was dead and one person was injured because a white Tundra had run over "that person."[3] Hr'g, Nov. 10, at 9:26 AM. She did not give her location. The second caller indicated that the Tundra left in the direction of Juncos and the grey vehicle left in the direction of Las Piedras.[4] Agent Sanabria sent her fellow JMPD officers this information as she received it. While on their way to Estancias de la Ceiba, Agents Figueroa and Rosa saw a white Toyota Tundra with tinted windows that matched the description they were given. Agent Figueroa informed Agent Sanabria that they had seen a matching vehicle and intended to intervene. From the time they received the first radio communication, it took the agents approximately two to four minutes to intervene with the Tundra. Agents Figueroa and Rosa proceeded to pull the Tundra over.

PRPD Agent Calderón had received a complaint from his duty agent stating that detonations had occurred in Estancias de la Ceiba on Road 198 in Juncos. While Agent Calderón and his partner, Agent Adams, were headed to Estancias de la Ceiba they also observed the white Tundra. They saw the JMPD vehicle turn around to follow the Tundra and turned around in pursuit as well.

The Tundra stopped on the side of the road across from Ralph's supermarket (hereinafter "scene of the intervention"). Agents Figueroa and Rosa approached the vehicle with guns drawn. Agent Rosa and Agent Calderón proceeded to the driver's side of the Tundra. In a strong voice,

---

[3] Agent Sanabria's testimony regarding this call is not entirely clear as to whether both the injured and dead individual were struck by a white Tundra or, if not, how the other individual died. Agent Sanabria first testified that the second caller told her, "that [she] should send an ambulance because there was a person who had been dead and another person who had been wounded because the person with the white tundra had run over her… had run over that person." Hr'g, Nov. 20, at 9:26 AM. She next described it as, "there was a person that was wounded and there was a person who was dead because the Tundra truck had run over the person." Id. Finally, it was described as "because the person who could have placed the call is telling me the description of the Toyota Tundra and what the Toyota Tundra did, it ran over a person." Id., at 10:19 AM.

[4] During cross examination Agent Sanabria first testified that the second call did not mention the grey vehicle, but she clarified, both in cross examination and on redirect, that the second call did say the grey vehicle was going to Las Piedras.

Agent Rosa told the driver of the vehicle, defendant, to turn off the engine and roll down the window. The driver did not react. Agent Calderón then told defendant via the loudspeaker on his patrol car to turn the vehicle off and lower the window. A few seconds after this second order, defendant lowered the window halfway.[5] The defendant was told to exit the vehicle. Although the sequence is in dispute, as will be addressed below, the following events occurred shortly thereafter: defendant asked what was going on, defendant stated that he was coming from Estancias de la Ceiba, Agent Rosa ordered defendant to throw himself on the ground, defendant was handcuffed, Agent Rosa informed defendant of his <u>Miranda</u> rights, and defendant was placed in a patrol car. Sometime after defendant was placed in the patrol car, law enforcement obtained his drivers' license, but they did not run any searches to see if he had a criminal record.

Agents Figueroa and Rosa then departed the scene of the intervention and traveled to Estancias de la Ceiba.[6] In Estancias de la Ceiba, the agents saw a residence with many people outside and, upon going inside, they found a deceased individual lying on the floor, covered with blood and bullet holes. They did not find anyone who had been hit by a vehicle. Agent Figueroa never returned to the scene of the intervention. After approximately ten to thirty minutes, Agent Rosa returned to the scene of the intervention. He informed law enforcement officers there of what he had observed at Estancias de la Ceiba. At this point the defendant was handcuffed in the patrol car.

Around 7:40 pm PRPD Inspector Oliver arrived at the scene of the intervention. When he arrived, defendant was still sitting in one of the PRPD vehicles. Inspector Oliver immediately

---

[5] The government witnesses disagreed regarding total time that elapsed between the first order and the defendant's eventual compliance. Agent Figueroa testified that it took defendant five minutes to comply. Agent Rosa testified it took defendant one minute to do so. Agent Calderón testified that it took defendant more than one minute, maybe two.

[6] Agent Figueroa testified that this trip took ten minutes, whereas Agent Rosa testified that this trip took one to one and a half minutes.

called the canine unit to send over a canine for firearms.  Agent Feliciano of the canine unit received a call around 7:45 pm to report with his canine to the scene of the intervention.

Agent Feliciano arrived around 8:10 or 8:15 pm. He was accompanied by his canine, Dax, who was duly certified and had the requisite training to detect firearms.[7] Agent Calderón retrieved defendant from the patrol car, so he could be present for the canine sniff. Agent Feliciano had the canine look around the Tundra, beginning with the rear. The canine alerted on the front passenger door. Agent Feliciano walked the canine back to his vehicle, but the canine pulled Agent Feliciano back to the Tundra and alerted on the driver's door.

The officers at the scene of the intervention did not have the necessary seals with them to secure the vehicle, so Inspector Oliver called the homicide unit to contact the people from forensics at Estancias de la Ceiba. Around 10:10 pm Agent Cortés brought the seals to the scene of the intervention. The truck was sealed shortly thereafter. The Tundra did not need to opened in order to load it into a tow truck. The Tundra and the defendant were simultaneously transferred to the command post in Caguas. On the following day, a search warrant was secured authorizing a search of the Tundra. According to Agent Feliciano's report, the search revealed a .40 caliber Glock pistol with forty five bullets, six magazines, and 2/8 of cocaine base.[8] Ex. 5.

## LEGAL ANALYSIS

### I.  __Franks__ Hearing

In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court mandated a hearing for a defendant who makes a "substantial preliminary showing that a false statement knowingly and

---

[7] A stipulation was reached by the parties regarding the canine's qualifications: "It shall be deemed a stipulated fact for purposes of this suppression hearing that on the 16th of May 2015, canine Dax was duly certified and had the required training to detect firearms." Hr'g, Nov. 13, at 10:18 AM.

[8] The report of the canine officer did not specify the unit of measure for the cocaine base. Both the criminal complaint and the motion to suppress merely state that there were two "zip-lock bags containing a substance that field-tested positive for cocaine." ECF Nos. 39; 39-2. The government's response in opposition states that it was "in excess of 28 grams of cocaine base." ECF No. 44, 4.

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . if the allegedly false statement is necessary to the finding of probable cause." Id. at 155-56.  In order to trigger this requirement, the Supreme Court, set very rigorous standards:

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

Id. at 171-72.

Defendant argues that, contrary to the affidavit in support of the search warrant, the recordings of 911 calls he received through discovery do not mention a white Toyota Tundra. ECF No. 39, 7. The government notes, however, that the calls received by Agent Sanabria were calls made to the JMPD. ECF No. 44, n.3.  These are separate and distinct from the calls that were received by the 911 system. Id. Further, the government states, Agents Figueroa and Rosa had no knowledge of the 911 calls. Id. Defendant's allegation, essentially a discovery issue, does rise to the substantial preliminary showing necessary for a Franks hearing. Further, defendant has neither provided an affidavit or sworn statement nor explained the absence of the same. Thus, the request for a Franks hearing was accordingly denied.

## II.    Seizure of Centeno

Police-citizen contact has three levels for Fourth Amendment purposes. The first level, a consensual encounter, allows police to "approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). The second level, an investigatory stop, occurs when officers "briefly detain an individual for questioning if the officer 'reasonably suspects that the person

apprehended is committing or has committed a crime'" under the authority of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) and progeny. <u>United States v. Camacho</u>, 661 F.3d 718, 726 (1st Cir. 2011) (quoting <u>Arizona v. Johnson</u>, 555 U.S. 323, 323 (2009)). Finally, de facto arrest at the third level "occurs when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." <u>United States v. Jones</u>, 700 F.3d 615, 624 (1st Cir. 2012) (internal quotations omitted). The quantum of proof necessary to justify the encounters increases with each level. No suspicion is required at the first level. <u>Young</u>, 105 F.3d at 6. The second level, as noted, requires reasonable suspicion. <u>Camacho</u>, 661 F.3d at 726. The third level must be supported by probable cause. <u>Young</u>, 105 F.3d at 6. Thus, for each step of the law enforcement officers' interactions with defendant here, we must determine which level of encounter is occurring.

### A.  The investigatory stop of the Tundra was lawful.

When law enforcement officers stop a moving vehicle this constitutes a seizure of the vehicle's occupants and triggers the protections of the Fourth Amendment. <u>United States v. Woodrum</u>, 202 F.3d 1, 5 (1st Cir. 2000). For such an investigative stop, "law enforcement agents may stop a moving automobile to investigate their *reasonable suspicion* that the vehicle's occupants were, are, or will be engaged in criminal activity." <u>United States v. Kimball</u>, 25 F.3d 1, 6 (1st Cir. 1994) (emphasis in original). When, as here, officers base the reasonable suspicion on information received from an anonymous source, the tip must have sufficient indicia of reliability. <u>United States v. Jones</u>, 700 F.3d 615, 622 (1st Cir. 2012). The calls here were sufficiently reliable and did provide reasonable suspicion.

i.   <u>There was sufficient indicia of reliability to support the anonymous calls.</u>

To determine whether an anonymous tip is supported by sufficient indicia of reliability the court must look at the totality of the circumstances. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990). This fact-specific inquiry is best served by comparing the circumstances of the Supreme Court cases that "provide the basic parameters." <u>United States v. Monteiro</u>, 447 F.3d 39, 44 (1st Cir. 2006).

The Supreme Court found the anonymous tip in <u>Adams v. Williams</u> reliably indicated that a man in a vehicle in a high crime area was carrying narcotics and a gun, because the informant was personally known to the officer, had provided reliable information in the past, and would be subject to prosecution for providing false information to the police. 407 U.S. 143, 144–46 (1972). The second case, <u>White</u>, involved an anonymous tip "that Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's motel, and that she would be in possession of about an ounce of cocaine." 496 U.S. 325, 327. Although it was a "close case," the tip was reliable because the caller predicted future activity that demonstrated "inside information" not available to the general public. <u>Id.</u> at 332.

Both cases, however, involve tips relating to concealed criminal activity. By contrast, the tip in <u>Florida v. J.L.</u> reporting "a young black male standing at a particular bus stop and wearing a plaid shirt and was carrying a gun" did not have sufficient indicia of reliability. 529 U.S. 266, 268 & 274 (2000). The Supreme Court held that the tip did not show that the informant had knowledge of concealed criminal activity and that the reliability determination must relate to

both the tip's tendency to identify a determinate person and its assertion of illegality. Id. at 272. In the most recent Supreme Court precedent on reliability, the fact that the tip was "contemporaneous with the observation of criminal activity and made under the stress of excitement caused by a startling event" weighted in favor of the caller's reliability. Navarette v. California, 134 S.Ct. 1683, 1689 (2014) (finding reliable a tip that the caller had just been run off the road by a specifically identified vehicle). Many circuits have held that tips reporting an ongoing emergency are entitled to a higher degree of reliability than a tip reporting general criminality. See United States v. Edwards, 761 F.3d 977 (9th Cir. 2014);  Robinson v. Howes, 663 F.3d 819, 830 (6th Cir. 2011) (affording greater weight to a tip reporting shots being fired); United States v. Simmons, 560 F.3d 98, 104-05 (2d Cir. 2009); United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir. 2002) ("[W]hen an *emergency* is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller"); cf. United States v. Hampton, 585 F.3d 1033 (7th Cir. 2009) (holding that Florida v. J.L. does not apply to ongoing emergencies). When the anonymous caller reports eyewitness knowledge of criminal conduct this imparts significant support to the reliability of the tip. United States v. Aviles-Vega, 783 F.3d 69, 76 (1st Cir. 2015).

Here there were sufficient indicia of reliability to allow the officers to trust the anonymous calls in making an investigatory stop. First, the consistencies between the calls from two different sources and the subsequent observations of the officers weigh in favor of the calls' reliability. The identification of the vehicles is the main consistency between the calls. Both calls reported a white Toyota Tundra; and both calls reported a grey vehicle. Additionally, the first call was sufficiently corroborated to create a suspicion of illegality because Agent Sanabria herself heard the detonations during the call. The information in the second call that a white

Toyota Tundra would be traveling out of Estancias de la Ceiba, towards Juncos, was also corroborated by the officers. When Agents Figueroa and Rosa were driving from Juncos, towards Estancias de la Ceiba, they encountered a white Toyota Tundra traveling in the opposite direction.[9] Although not all details of the anonymous calls were corroborated when the officers intervened with the Tundra—for instance there was no corroboration that someone had been run over—that is not the level of corroboration necessary to initiate a stop. United States v. Diallo, 29 F.3d 23, 26 (1st Cir. 1994) ("[T]he police do not have to corroborate every detail of the informant's tip"). Second, both calls deserve the benefit of a higher level of reliability because both were emergency calls reporting ongoing criminal activity. The callers were not reporting activity that was invisible to the public like the concealed drugs and weapon in Adams. Nor were the callers reporting criminal activity that would occur in the future, unlike the predictive tip in White. Rather this case is most similar to the dangerous driving tip in Navarette. It is reasonable to conclude that the first call was made "contemporaneous with the observation of criminal activity" because Agent Sanabria was able to overhear the gunfire sounds in the background. Both calls were also made under the stress of excitement as seeing a shooting and seeing someone hit by a car are undoubtedly "startling event[s]." Thus, both the corroboration and the emergency nature of the situation indicate that these calls were of sufficient reliability.

---

[9] Defense counsel attempted to allege that the second caller would not have been able to see the direction that the Tundra was traveling. Investigator Montilla marked Tite Curet Street on a map of Estancias de la Ceiba and it does appear that someone standing on that street would not be able to observe the Tundra's direction of travel. This argument assumes, without factual foundation, however, that the caller did not move to follow the Tundra. Agent Sanabria testified that she did not know from where in Estancias de la Ceiba the second call was made. Even with such a showing, it would not be dispositive here. The information known by the officers at this point was that someone had reported that the Tundra would be travelling in certain direction, and then they saw a Tundra travelling in that same direction. In a quickly evolving situation like this one involving gunfire and a potential vehicular battery, the officers are not obligated to get out a map and ensure that the anonymous caller could see the direction of travel.

ii.   There was reasonable suspicion to stop the Tundra.

Having determined that the anonymous calls are sufficiently reliable, these tips must also provide a reasonable suspicion. Under the reasonable suspicion standard, looking at the totality of the circumstances, "the stop must be supported by a reasonable and articulable suspicion of criminal activity and that the detention must be reasonable under the circumstances." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). Although reasonable suspicion is "intermediate, indeterminate standard," essentially it "requires more than a mere hunch but less than probable cause." Camacho, 661 F.3d at 726. "In determining whether an officer had reasonable suspicion, we look to the facts 'available to the officer at the moment of the seizure or the search.'" Jones, 700 F.3d at 621 (quoting Terry, 392 U.S. at 22).

The two calls here gave officers reasonable suspicion to stop defendant, who was travelling in a white Toyota Tundra with tinted windows. The first call reported a transfer of firearms in Estancias de la Ceiba from a white Toyota Tundra with tinted windows to a grey vehicle. Two individuals from the grey vehicle, the first caller reported, subsequently entered a house and started shooting. The second call reported someone was deceased and another person was injured because a white Toyota Tundra had hit a person. The second caller reported that the Tundra left in the direction of Juncos. When the officers encountered a white Toyota Tundra leaving Estancias de la Ceiba in the direction of Juncos, they had more than a "mere hunch" that the Tundra had been involved in some sort of criminal activity. Some testimony was introduced that the officers were directed to Road 198 as where the Tundra would be travelling. Defendant appeared to argue, although never fully articulated, that because there are multiple exits and entrances to Road 198, it was unreasonable to expect either that the Tundra would actually be travelling that road or that other Tundra vehicles could not have entered the road from a different

11

entrance than at Estancias de la Ceiba. The key fact, however, is that Road 198 is a road that travels from Estancias de la Ceiba to Juncos. When the officer saw a white Tundra with tinted windows traveling in the direction the anonymous caller indicated, they were entitled to stop the vehicle and inquire further of the driver.  Defendant also made much out of Agent Figueroa's testimony that if she saw two white Tundras with tinted windows, she would have detained both.[10] The mere fact that officers can have reasonable suspicion to detain multiple vehicles that match the same description does not eliminate that suspicion. Rather, it emphasizes why such detentions are limited in scope to taking actions that quickly confirm or dispel the suspicion. Holding to the contrary would greatly hinder the ability of law enforcement officers to effectively respond to such serious reports as the ones here. Therefore it was lawful for the officers to initiate an investigatory stop to confirm or dispel their suspicions.

### B.  The investigatory stop escalated to a de facto arrest.

In the case at bar there are multiple steps in the intervention that might convert the investigatory stop into a de facto arrest. The defendant argues that ordering defendant to the ground triggered an arrest. The government, on the other hand, argues that the arrest occurred when the defendant was read his <u>Miranda</u> rights, which they allege occurred after the defendant was on the ground handcuffed. At the very least, according the government, the officers had probable cause to arrest once Agent Rosa reported a body was found shot dead in Estancias de la Ceiba.

Generally a person is under "de facto arrest" when, "in light of the totality of the circumstances … a reasonable person in the suspect's position would have understood her position 'to be tantamount to being under arrest.'" <u>United States v. Chaney</u>, 647 F.3d 401, 409

---

[10] In response to a hypothetical from the court, defense counsel conceded that the problem in these situations is not as much the stopping of both vehicles, but the immediate arrest. This is an issue that will be addressed below.

(1st Cir. 2011) (internal citations omitted). In the context of a <u>Terry</u> stop, however, a greater restraint on an individual's liberty is allowed before it is considered a de facto arrest because of the legitimate need for officers to take measures to protect their own safety and the safety of others. <u>Jones</u>, 700 F.3d at 624. In "a typical borderline case" where there are "arrest-like features," "the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a <u>Terry</u>-type stop." <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 15 (1st Cir. 1998). Relevant factors include "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect." <u>United States v. Rabbia</u>, 699 F.3d 85, 91 (1st Cir. 2012); <u>see also</u> <u>United States v. Mayen-Muñoz</u>, 844 F.Supp.2d 251 (D.R.I. 2012) ("Factors to consider include: length of the detention; restrictions placed on the individual's movement, by use of handcuffs or other means; use of force, such as forcing the suspect to the ground; information conveyed (or not conveyed) to the detainee, such as informing the detainee that he or she is under arrest or not under arrest or providing <u>Miranda</u> warnings; the number of law enforcement officers present at the scene; whether weapons were brandished; whether the encounter took place in a neutral location; and whether the suspect was transported to another location during the course of the detention."). When law enforcement officers have reasonable suspicion that an individual is armed they are, "entitled 'to take swift measures to discover the true facts and neutralize the threat of harm.'" <u>United States v. Taylor</u>, 162 F.3d 12, 16 (1st Cir. 1998) (quoting <u>Terry</u>, 392 U.S. at 30).

These measures include, but are not limited to, surrounding the car with multiple police cars, approaching with firearms drawn, ordering the driver out, ordering the driver to the ground, handcuffing the driver, and conducting a pat down. <u>See</u> <u>id.</u>; <u>Jones</u>, 700 F.3d at 625; <u>United States</u>

13

v. Jackson, 918 F.2d 236, 238 (1st Cir. 1990) ("The police may conduct an investigatory stop by blocking the egress of a vehicle in which a criminal suspect is riding, and may approach the vehicle with weapons at the ready on a reasonable suspicion that its occupants are armed."); Acosta-Colon, 157 F.3d at 18–19 ("There is no question that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, 'substantially aggravates the intrusiveness of a putative Terry stop", it is clear that "the use of handcuffs … does not automatically convert the encounter into a de facto arrest."). To justify the use of these measures, the burden is on the government to "point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officer, the public, or the suspect himself to an undue risk of harm." Id., at 19 (emphasis in original). In using these measures, however, officers must still act within the dimensions of a Terry investigatory stop that contemplates means of investigation likely to confirm or dispel suspicion quickly. United States v. Trueber, 238 F.3d 79, 91–92 (1st Cir. 2001) (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)); United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) (holding a seventy-five minute stop on suspicion of armed robbery was not an arrest even though defendant was read his rights and detained in a police car because defendant was told he was not under arrest, he was not handcuffed, officers used a number of different investigative techniques including a registration check and bringing a witness to identify the individual, and defendant's responses were evasive). These measures cannot be justified when "wholly absent from Defendant's initial detention was any sort of investigation, questioning, or confirming or dispelling of suspicions—the very purpose for which these lesser-intrusions are permitted under the Fourth Amendment." Mayen-Muñoz, 844 F. Supp. 2d at 257.

14

Here, there are specific facts and circumstances amounting to reasonable suspicion that the driver might be armed. The first call reported that in Estancias de la Ceiba a man from a white Toyota Tundra with tinted windows transferred weapons to a grey vehicle. Further, the caller described, the occupants of the grey vehicle drove down the street, entered a home, and started shooting. Agent Sanabria had heard the shots herself over the phone. While Agents Figueroa and Rosa were driving to Estancias de la Ceiba, they were informed of a second anonymous call, reporting that a white Tundra had run over at least one individual. This call indicated that the white Tundra departed towards Juncos. The officers traveled from Juncos towards Estancias de la Ceiba, and within two to four minutes they encountered a white Toyota Tundra with tinted windows.  Agents Rosa and Calderón approached the driver's door and Agent Figueroa approached the passenger side, with their weapons drawn. Agent Rosa ordered the driver, defendant, to turn off the engine and roll down the window. Defendant did not immediately comply. Agent Calderón then went to his patrol car and announced over the speaker for defendant to turn off the engine and roll down the window.

Ultimately, defendant rolled his window down halfway. The witnesses were inconsistent regarding how much time elapsed from the first order to defendant's eventual compliance. Agents Rosa and Calderón testified it took approximately a minute, but Agent Figueroa testified that it took five minutes. As Agent Rosa and Agent Calderón's time estimates are roughly consistent, the court finds that it took the defendant took approximately a minute. Agent Rosa then told defendant to exit the vehicle. The sequence of the next events differs from witness to witness. As previously noted the witnesses are in agreement that the following events occurred: defendant asked what was going on, stated that he was coming from Estancias de la Ceiba, was

ordered to throw himself on the ground, was handcuffed, and was informed of his <u>Miranda</u> rights.

According to Agent Figueroa, "The gentleman got out of the vehicle saying 'what was going on', 'why was he being detained?'" Hr'g, Nov. 10, at 11:00 AM. She testified that Agent Rosa then asked defendant where he was coming from. Defendant responded, she said, "that he was coming from Estancias de la Ceiba Urbanization and he was looking for houses to lease" and "that he had seen a lot of people and that he had seen cars coming out of the urbanization." <u>Id.</u> at 11:02 AM. Agent Figueroa did not remember if defendant was handcuffed at that time. After defendant made this statement, testified Agent Figueroa, Agent Rosa gave him the <u>Miranda</u> rights. Although Agent Figueroa testified that the defendant "was asked to hit the floor", <u>id.</u> at 11:50 AM, she did not know whether it was before or after defendant was read his <u>Miranda</u> rights. She also testified that after he was asked to hit the floor, defendant was handcuffed. Additionally, at some point after defendant was on the ground, she used a flashlight to "verify" the inside through the Tundra's tinted windows. <u>Id.</u>, at 12:03 PM.

Agent Rosa, on the other hand, testified that defendant "opened the door and [I] told him to hit the floor," and defendant complied. Hr'g, Nov. 10, at 2:08 PM. When asked "after he hit the floor, what happened," Agent Rosa answered, "I handcuffed him, I placed the handcuffs on him." <u>Id.</u>, at 2:09 PM. He testified that defendant was handcuffed "first, for our safety, then, because of the pickup being suspicious as to the incidents that had taken place before." <u>Id.</u> It was then, according to Agent Rosa, that he then read defendant his <u>Miranda</u> rights. Agent Rosa testified that Agent Calderón then "told him that he was under arrest … because of the incident that had taken place at that urbanization Estancias de la Ceiba and they had described the same vehicle that he had." <u>Id.</u> at 2:12 PM. When asked if defendant made any statements, Agent Rosa

testified that defendant stated "that he was in the urbanization looking for a house to rent." Id., at 2:13 PM. He did not, however, clarify when this occurred in the timeline of events.

Agent Calderón's testimony was substantially similar to Agent Rosa's. Agent Calderón testified that after Agent Rosa asked defendant to open the door, "he asked him to lay down on the floor." Hr'g, Nov. 10, at 2:59 PM. Then, "the handcuffs were put on him." Id. When asked if defendant complied with Agent Rosa's instructions to lie on the floor, Agent Calderón responded in the affirmative. When asked, "after agent Rosa put the handcuffs on him, what, if anything happened?" Agent Calderón responded, "the gentleman that was in the vehicle was asking what was going on, why was he being stopped." Id. Then, "it was explained to him that he had been detained on account of an incident that occurred at Estancias de la Ceiba urbanization and they were describing a vehicle that was similar to the one that he was driving." Id., at 3:00 PM. Agent Calderón testified that, "after it is explained to him, he said that the police had it against him, and that he was in the urbanization looking for a house to rent." Id., at 3:01 PM. Further, "he said that he was looking for a residence to rent and that an incident had started up there, an uproar and that he, that several vehicles left that location and that he left also." Id., at 3:02 PM. When asked if defendant had been advised of his rights before making these statements, Agent Calderón responded, "my understanding is that my fellow officer Rosa did read his rights to him, he told him his rights." Id. Later, however, in response to a question from the court regarding what defendant's reaction was to having his rights read at the scene of the intervention, Agent Calderón testified that "he did not talk, he refused to sign." Id. at 4:11 PM. It is not clear that these statements are truly contradictory, however, because Agent Calderón indicated that defendant was twice given his rights, once his "colleague told him of his rights" and another "he read them." Id. at 4:10 PM.  Although Agent Calderón did not testify that he told defendant he

was under arrest, he did respond in the affirmative to the question, "Once you detain him and arrest him, that's when Agent Rosa left to the house in Estancias de la Ceiba, is that correct?"

It is apparent that, contrary to defendant's assertion, merely ordering him to the ground and handcuffing him did not automatically equate to an arrest. All of the actions taken in this case are justified to ensure officer safety. Here, however, Agent Rosa testified that Agent Calderón told defendant that he was under arrest after the defendant was given his Miranda rights and was handcuffed on the ground. This is consistent with the moment of arrest first identified by the government. Because the test for de facto arrest is whether "a reasonable person in the suspect's position would have understood her position 'to be tantamount to being under arrest,'" Chaney, 647 F.3d at 409 (internal citations omitted), this statement distinguishes this case from a mere investigatory stop. Thus, even if the actions began as a measure to ensure officer safety, it became a de facto arrest when the defendant was informed he was under arrest.

Two important factors following defendant's handcuffing further distinguish this case from cases that have been held not to be a "de facto" arrest. First, none of the officers testified that any form of pat-down was conducted or questions asked to determine if defendant had a firearm or anything that could pose a safety concern to the officer. The officers did use a flashlight to look inside the cab of the Tundra. The only other testimony regarding procedures following the first flurry of activity is Agent Calderón's testimony that after defendant was read his rights, the officers "stood him up from the floor and we seated him in the patrol car of the commonwealth police." Hr'g, Nov. 10, at 3:03 PM. Second, officers' actions after the initial detention of defendant are inconsistent with a search to confirm or dispel suspicion with regard to this defendant. Once defendant was secured, Agents Figueroa and Rosa went Estancias de la Ceiba. There was no testimony, however, they or any of the other officers there took any

measures at all to verify if the individual in their custody was the gentleman mentioned in the first call or even that the Tundra was the specific vehicle observed at the scene of the shooting. This is particularly vexing on the facts of this case, because neither anonymous call gave any identifying information about the gentleman; only the vehicles were described and even those descriptions were in the most generic terms. This barrier is not insurmountable to create reasonable suspicion to initiate an investigatory stop, but this is the exact sort of information such a stop allows officers to gather in order to eventually meet the higher burden of probable cause to arrest.

Viewing all the facts together, defendant was under a de facto arrest inconsistent with a Terry stop because he was pulled over by four police officers (at least two of whom had their weapons drawn), ordered out of the vehicle, told to hit the ground, handcuffed, read his rights, told that he was under arrest, and placed in a patrol car.  Using either when defendant was told he was under arrest or when Agent Rosa returned from Estancias de la Ceiba as the potential moment of arrest, there was not probable cause to arrest.

### C.  *The officers did not have probable cause to arrest defendant.*

"Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). "The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." United States v. Winchenbach, 197 F.3d 548, 555–56 (1st Cir. 1999). This is an objective inquiry, viewing the

totality of the circumstances from the perspective of a reasonable person in the position of the officer. Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009). The probable cause determination is made based on the "collective knowledge and information of all the officers involved establishes probable cause for the arrest." United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986).

While the term "probable cause" evades precise definition, the First Circuit has stated that it "means a reasonable likelihood." Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) ("the question is whether the evidence would 'warrant a man of reasonable caution' in believing that a crime has been committed and committed by the person to be arrested"). Further, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." Ybarra v. Illinois, 444 U.S. 85, 91 (1979); see, e.g., United States v. Encarnacion-Montero, Crim. No. 05-362 (DRD), 2006 WL 2571404, at *11–16 (D.P.R. Sept. 5, 20016) (finding particularized probable cause to arrest the driver of a Ford Ranger during a kidnapping case when, after the kidnapper indicated he could see the undercover vehicle travelling to the ransom drop location, the officer inside the undercover vehicle observed a black Ford Ranger following, the Ford then stopped while the ransom bag was dropped, and the driver retrieved the ransom bag and put it in his passenger seat); United States v. Tormes-Ortiz, 710 F.Supp. 412 (D.P.R. 1989) (noting that it was a close call, but finding particularized probable cause to arrest after police exchanged fire at an airstrip known for drug smuggling with men who then fled, found a vehicle nearby containing weapons and cocaine, following a trail of footprints through tall grass, officers found footprints of tennis shoes in the mud, after putting out a notice—indicating the individuals would have scratches and be wearing wet and muddy clothes—multiple people reported seeing matching individuals, including one report that the

individuals were cleaning themselves in a pool of water, the officers then found two men in the nearby town with mud-stained clothes, dripping with water, relatively clean tennis shoes, and scratches on their arms and faces, officer approached one individual and asked where he was from, when he said he was not from that area and the officer arrested immediately); cf. United States v. Silva-Rentas, Crim. No. 14-0387 (PAD), 2015 WL 1806703 (D.P.R. April 21, 2015), adopted by 2015 WL 3490134 (Jun. 3, 2015) (finding tip from a confidential informant not sufficiently reliable to support a finding of probable cause because, inter alia, although tip indicated that a white Toyota Sequoia would be involved in a drug transaction in the Navarro ward of Gurabo, the tip did not indicate a specific location where the Sequoia would be found or provide any way to distinguish the particular Sequoia from every other white Sequoia).

　　　As previously noted, the government argues that the arrest occurred when the defendant was read his Miranda rights, but that at the very least, probable cause existed once Agent Rosa reported a body was found in Estancias de la Ceiba. The question then becomes, probable cause to arrest for what crime or infraction? There are several potential violations of Commonwealth and federal law here that could have been investigated. None of the officers testified what crime defendant was told he was being arrested for or whether any charges were pursued at the local level.[11] The government asserted multiple possible violations for which the arrest could have been made: accessory to the shooting, assault, transferring firearms, illegal possession of a

---

[11] The officers' testimony did not clarify for what crime the officers themselves thought they were arresting defendant. Agent Figueroa testified "we thought that he was the person" and "that he had committed the offense, the acts." Hr'g, Nov. 10, 11:04 AM, 11:08 AM. The government clarified by asking if she was referring to the detonations, and Agent Figueroa testified, "correct and the call that was saying that the vehicle, the white Tundra Toyota had made a left turn towards Road 198." Id. at 11:09 AM. Agent Rosa testified that "Calderón told him that he was under arrest because of the incident that had taken place, some detonations, because of the incident that had taken place at that urbanization Estancias de la Ceiba and they had described the same vehicle that he had." Hr'g, Nov. 10, at 2:12 PM. Further there was no testimony regarding what, if anything, defendant was booked for when he arrived at the Caguas police station.

firearm, violation of Puerto Rico's concealed carry law. We will examine the basis for each of these in turn.

i.  <u>There was no probable cause to arrest defendant at the time he was read his rights.</u>

The first potential crime is accessory to the shooting. The first call stated that a gentleman from the white Tundra with tinted windows transferred weapons to a grey vehicle. The grey vehicle moved down the street, two individuals got out, went into a house, and started shooting. Agent Sanabria heard the detonations over the phone. When asked to describe these detonations, she stated these sounded like "detonations from a weapon" and that there were "multiple detonations." <u>Id.</u> at 10:35 AM. Although Agent Sanabria's testimony regarding the second call lacked a certain amount of clarity, her final statement on the content of the call was that the Tundra ran over "a person." <u>Id.</u>, at 10:19 AM. The call did not refer to weapons or shooting or detonations; but, even though it appears to indicate that the white Tundra only "ran over" a single person, it did say that one person was dead. Particularly given the fast paced nature of this emergency situation, it is reasonable for Agent Sanabria and her fellow officers consider the possibility that the dead individual was a victim of the reported shooting. The evidence of this, however, is not sufficient to amount to probable cause to arrest defendant. Probable cause must be "particularized *with respect to that person*." <u>Ybarra</u>, 444 U.S. at 91 (emphasis added). The tips gave no information as to who the man in the white Tundra was other than he was a male. Even the evidence with regard to the Tundra is somewhat generalized, other than identifying the model and indicating that the windows are tinted, there is no other information to distinguish this white Tundra from any other. As seen in <u>Encarnacion-Montero,</u> the officers did not need to know the identity of the man described in the anonymous calls, but in order to arrest they did need information that was connected directly to this particular individual. <u>See</u> 2006 WL 2571404, at

*11–16. Similarly, the officers did not have to have an identification of the individual involved in the anonymous calls—such as a physical description of height, weight, or hair color, etc.—if, as in <u>Tormes-Ortiz</u>, they could point to specific factors that would distinguish the individual. There the officers had strong reason to believe that the individuals suspected of being involved in narco-trafficking at a nearby airstrip would be muddy, covered in scratches, and that at least one would be wearing tennis shoes. 710 F.Supp. at 415. Multiple townspeople identified the defendants as matching that description, including one man who saw individuals matching the description cleaning themselves in a pool of water. When the officers encountered two individuals in the general vicinity of the crime hours after its commission, wearing mud-stained clothes and tennis shoes, with scratches on their arms and faces, and one admitted to not being from the town, the evidence was sufficiently particularized with respect to both. <u>Id.</u> Here, there are no factors that, although still somewhat ambiguous, link the defendant, and not just a car similar to his, to activity reported in the anonymous call. This lack of particularity prevents a finding of probable cause to arrest defendant.

The second possible criminal activity was that defendant had "run over" someone. This claim is based solely on the second call, which reported that at least one person had been hit by a white Tundra. No one testified as to the Tundra's exterior condition. Although multiple photos showing that the Tundra has various scratches and dents were entered into evidence, it cannot be determined from the photos whether any are consistent with impacting a person. <u>See</u> Exs. H; I; J; K; L; 2; 3. This single tip, from an unidentified source, without any additional corroboration of someone being run over or any particularity with regards to this defendant is not sufficient to establish probable cause.

Third, the government alleges there was probable cause to arrest for illegal transfer of firearms and, because Puerto Rico is a concealed carry jurisdiction, the unlawful display of firearms. See Aviles Vega, 783 F.3d at 73 (noting it qualified as criminal activity to openly pass a firearm between passengers of a vehicle). This claim is based solely on the first call. Agent Sanabria testified that this first caller described a white Tundra, tinted, and a grey vehicle. The caller stated "that from the Tundra SUV ("guagua"), this gentleman got out and delivered some weapons to the grey vehicle." Hr'g, Nov. 10, at 9:23 AM. This transaction was not mentioned in the second call. Further, this call has the same defective lack of particularity with respect to defendant. This single, uncorroborated mention of an undescribed gentleman driving a generically described vehicle, transferring weapons is not sufficient for probable cause to arrest on the basis of firearms law violations.

Finally, the government argues that there was probable cause that defendant was in illegal possession of a firearm. In support of this position, the government points to the detonations, the reported transfer of weapons, and defendant's failure to immediately comply with officers' orders at the scene of the intervention. While these allegations, taken together, might be sufficient to create a reasonable suspicion that defendant is armed, they are not sufficient to create probable cause to believe that defendant is not only in possession of a firearm, but is illegally so. The first two elements of the government's argument, the detonations and transfer of firearms, lack any particularity with respect to this defendant. While defendant's failure to immediately comply rightly gives officers reason to pause, it is not sufficient, as the sole evidence particularized against this defendant, to create probable cause to arrest. Additionally, it was not until defendant was placed in the patrol car that the officers even knew defendant's name. They could not have known then whether defendant had a permit to possess firearms or

24

whether he fell into the category of persons prohibited from possession of firearms, such as convicted felons, drug users, or illegal aliens.

    ii.  <u>There was no probable cause to arrest defendant when Agent Rosa returned to the scene of the intervention.</u>

Alternatively, the government argues that there was probable cause to arrest once Agent Rosa returned to the scene of the intervention from the scene of the shooting. The testimony did not develop any further facts regarding the firearms law violations; thus, there is no need to reexamine the probable cause for those infractions. The only remaining potential infractions that could give rise to probable cause are accessory to murder or vehicular battery.

The accessory to murder allegation was bolstered in some respects by the findings at the shooting location. When the officers first intervened with the white Toyota Tundra, they knew of one anonymous call indicating that in Estancias de la Ceiba a gentleman from a white Tundra transferred weapons to a grey vehicle, the grey vehicle proceeded down the road, and two individuals exited the vehicle and began shooting. The officers knew Agent Sanabria heard the detonations herself. The officers were aware that a second call had also spoken of a grey vehicle and white Toyota Tundra and had informed that one person was dead, although it did not identify the cause. This call said that the white Tundra was headed towards Juncos. When the officers were driving from Juncos to Estancias de la Ceiba they did encounter a white Toyota Tundra with tinted windows. Upon intervening with the vehicle, they discovered only a male driver within. This man indicated that he was coming from Estancias de la Ceiba where, he said, he was searching for houses to lease. When Agents Figueroa and Rosa arrived at Estancias de la Ceiba, they found a "person that was dead," Hr'g, Nov. 10, at 2:15 PM, "covered with blood and many bullet impacts." <u>Id.</u>, at 11:14 AM. This information corroborated the first call's report of shots fired in Estancias de la Ceiba. There was no testimony, however, that anyone at Estancias de la

Ceiba gave any information to help identify the man in the Tundra or that linked defendant to the shooting. Thus, the lack of particularity with respect to defendant persists, regardless of the confirmation that someone died as a result of the shooting. Even after Agent Rosa returned to the scene of the intervention, there was not particularized probable cause that defendant had been involved in the Estancias de la Ceiba shooting.

Finally, the suspicion of vehicular battery begins with an anonymous call indicating that a white Toyota Tundra "ran over a person" in Estancias de la Ceiba. Hr'g, Nov. 10, at 10:19 AM. Adopting this second arrest timeline adds more detail to this probable cause analysis, but does nothing to bolster it. Agent Figueroa testified that they did not find anyone in Estancias de la Ceiba who had been run over. Thus, Agent Rosa's return did not add to, but perhaps detracted from, the probable cause finding for vehicular battery.

As the officers did not have probable cause to arrest the defendant under any of the government's asserted premises, the arrest of defendant was unlawful.[12]

### III.    Statements

Defendant has moved to suppress any statements attributed to him that resulted from the illegal stop.  The statements at issue are defendant's alleged statements made at the scene of the intervention regarding where he was coming from and what, if anything, he had seen.[13] "Miranda warnings must be given before a suspect is subjected to custodial interrogation." United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). An individual is in custody for Miranda when he is under formal arrest or when "a reasonable man in the suspect's shoes would have understood" that the restraint on his freedom of movement was "of the degree associated with a formal

---

[12] Not once did the government argue that the defendant was charged by local authorities regarding any of these offenses. As previously noted, there might be other violations of Commonwealth or federal law that the officers could investigate, but the court limits its analysis to the potential violations the government put forward.

[13] No evidence was presented of any statements made after defendant was placed in the patrol car.

arrest." Id. (internal quotations omitted). "As a general rule, Terry stops do not implicate the requirements of Miranda because 'Terry stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings.'" United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986) (internal quotations omitted). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes," however, "he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984); see also United States v. Taylor, 162 F.3d 12, 22 (1st Cir. 1998) (finding an investigatory stop did not amount to custody, even though the officers approached the vehicle with weapons drawn, where defendant was not treated harshly by the officers, in handcuffs at the time, told he was under arrest, and the interaction took place on a public street).  Interrogation includes both questioning and its "functional equivalent" that police should know is "reasonably likely to elicit an incriminating response" from a reasonable person in the same circumstances. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015).

Although there were three different timelines advanced, only Agent Figueroa and Agent Calderón clearly placed the questioning and statements in the timeline. Agent Rosa did testify that defendant stated "he was in the urbanization looking for a house to rent," Hr'g, Nov. 10, at 2:13 PM, but he did not state at which point during the stop this occurred.  Agent Figueroa testified that defendant exited the vehicle asking what was going on and that Agent Rosa then asked defendant from where he was coming. It was then, according to Agent Figueroa, that defendant stated "he was coming from Estancias de la Ceiba urbanization and he was looking for

houses to lease" and "that he had seen a lot of people and that he had seen cars coming out of the urbanization." Hr'g, Nov. 10, at 11:02 AM. Specifically, Agent Figueroa testified that the statement was made after defendant exited the vehicle, but before defendant was on the ground. It was only after the defendant's statement, according to Agent Figueroa, that Agent Rosa gave him the <u>Miranda</u> warnings.

Agent Calderón's testimony regarding the timeline stands in direct contrast to Agent Figueroa's. He testified that defendant asked about what was going on only after he was on the ground and handcuffed. "It was then explained to him," according to Agent Calderón, "that he had been detained on account of an incident that occurred at Estancias de la Ceiba urbanization and they were describing a vehicle that was similar to the one he was driving." <u>Id.</u>, at 3:00 PM. Agent Calderón testified that after this explanation, defendant stated "that the police had it against him," "that he was in the urbanization looking for a house to rent," "that an incident had started up there," and "that several vehicles left that location and that he left also." <u>Id.</u> at 3:01 PM. In response to a question asking if defendant was advised of his rights prior to the statements, Agent Calderón responded, "my understanding is that my fellow officer Rosa did read his rights to him, he told him his rights." <u>Id.</u> at 3:02 PM. Agent Calderón indicated that defendant was twice given his rights, once his "colleague told him of his rights" and another "he read them." <u>Id.</u> at 4:10 PM. Agent Calderón is the only officer to testify about the alleged statement that the police had it against him and that defendant was twice provided his rights. Therefore, the court credits Agent Figueroa's version because it was the most consistent and had the most specificity regarding the timing.

Regardless of whether the court credits the testimony of Agent Figueroa or Agent Calderón, each is missing an essential element to require <u>Miranda</u>. Agent Figueroa's version falls

squarely within the bounds of a <u>Terry</u> stop, thus, missing the custody component. According to Agent Figueroa the statement was made before defendant was on the ground, handcuffed, or in the police car. At this point his vehicle had been stopped, officers had approached with weapons drawn,[14] and he had been ordered out of the car. These actions are all consistent, as discussed above, with an investigatory stop. Further, as in <u>Taylor</u>, the officers did not treat defendant harshly, defendant was neither placed in handcuffs nor told he was under arrest at this point, and the encounter occurred on a public road. In this less "dominating" environment, the officers were entitled to ask defendant questions without providing his <u>Miranda</u> warnings. <u>See</u> <u>Streifel</u>, 781 F.2d at 958. In Agent Calderón's version, defendant made his statement in response to the officers' telling him why he had been pulled over. Agent Calderón makes no reference to defendant being asked any questions. Rather, the officers were just responding to the defendant's question. Thus, under either version, the officers were not required to give defendant his <u>Miranda</u> warnings prior to defendant's statement. Therefore, with regard to defendant's statements, the motion to suppress should be denied.

### IV.   Vehicle Search

#### A. The defendant has not met the burden of showing officer's conducted a warrantless search of the vehicle.

Generally, "[t]he government bears the burden of proving the lawfulness of [a] search." <u>United States v. Lopez</u>, 380 F.3d 538, 543 (1st Cir. 2004). The initial burden, however, is on the defendant to "display a violation of some constitutional or statutory right justifying suppression." <u>United States v. Feldman</u>, 606 F.2d 673, 679 n.11 (6th Cir. 1979); <u>see</u> <u>also</u> <u>United States v. Bachner</u>, 706 F.2d 1121, 1125 (11th Cir. 1983) (holding that "[t]he person who asserts his rights were violated under the fourth amendment has the burden of alleging and, if challenged, of

---

[14] There was no testimony regarding when the officers re-holstered their weapons.

establishing" an unreasonable invasion of claimant's reasonable expectation of privacy); United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977) (holding that "[i]t is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing" unless "a defendant produces evidence that he was arrested or subjected to a search without a warrant").

Here, defendant presented evidence seeming to allege that the officers themselves searched the Tundra while it was at the scene of the intervention. This issue revolves around the windows of the Tundra. All testimony regarding defendant's actions was consistent that defendant rolled his driver's window halfway down. There was no further testimony about either the defendant or someone else raising or lowering any other windows. Agent Figueroa testified that when she verified the inside of the truck with a flashlight, the windows were up. She then immediately left and went to the scene of the shooting. Agent Rosa testified that he did not "search" the vehicle at the time of the initial intervention, but did "look inside."[15] Hr'g, Nov. 10, 2:21 PM. Agent Calderón did not testify how he remembered the windows, but rather, verified what a series of photos showed. He confirmed that exhibit J—an image of the driver's side of the Tundra before it was sealed—shows both windows down and that exhibit L—an image of the opposite side once sealed—shows both windows up. Inspector Oliver testified that when he arrived at the scene, he remembers the driver's window being "open to the middle," but does not remember as to the others. Hr'g, Nov. 13, at 10:06 AM. Further he confirmed that the Tundra was loaded onto a tow truck without requiring the truck to be opened. Agent Feliciano also testified that the window on the driver's side was "half open." Id. at 10:37 AM. Defense counsel then confronted Agent Feliciano with a series of photographs, although counsel never stated on the record which exhibits or identifications were being shown. It is clear from the testimony that

---

[15] There was no testimony as to how Agent Rosa looked inside.

Agent Feliciano agreed that the images showed his canine, Dax, as well as the Tundra with three windows down. Together this testimony does not add up; it is clear that at some point someone lowered the windows and then, before the car was sealed, the windows were raised again. Defendant, however, presented no theory as to how this occurred, for instance, whether the windows were lowered for safety to ensure that no one was hiding behind the tinted windows or instead to conduct a full search. Merely indicating inconsistent evidence is not sufficient to meet the defendant's burden to display a violation of a constitutional right.

### B.  The seized evidence was fruit of the poisonous tree.

Defendant argues that, if the arrest is found unlawful, the fruits of that arrest should be suppressed. ECF No. 39, 12.  Just because defendant was arrested without probable cause, however, does not automatically result in the suppression of all subsequently discovered evidence.  There are three separate but related ways in which evidence is not the fruit of an unlawful arrest: attenuation, inevitable discovery, or an independent source.

Determining whether the discovery of evidence was sufficiently attenuated from the primary illegality is not merely a "but for" test, but rather is a fact-specific inquiry looking at whether the evidence was found using means "sufficiently distinguishable" from the primary taint. United States v. Pimental, 645 F.2d 85, 86 (1st Cir. 1981). The relevant considerations include, but are not limited to, "(1) the time that elapsed between the underlying illegality and the later acquisition of the evidence at issue; (2) the presence or absence of intervening circumstances between those points in time; and (3) the purpose and flagrancy of the official misconduct in question." United States v. Cordero-Rosario, 786 F.3d 64, 76 (1st Cir. 2015). Although this test was developed to determine when a confession was sufficiently voluntary, it has since "become the test of whether legally obtained evidence gained as a result of prior illegal

police conduct is sufficiently attenuated from the underlying illegality in all exclusionary rule contexts." United States v. Goodrich, 183 F.Supp.2d 135, 146 (D. Mass. 2001). The independent source doctrine applies when tainted evidence is also found through a non-tainted source. Murray v. United States, 487 U.S. 533, 538–39 (1988). The inevitable discovery doctrine is "an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Id. at 539 (emphasis in original). "In evaluating inevitable discovery claims, we ask three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006).

### i. The canine alert was tainted by the prior unlawful arrest.

As the canine alert occurred after either of the two proposed arrest times, we shall first determine whether the alert fell within any of the exceptions to the fruit of the poisonous tree. To determine if the alert was sufficiently attenuated from the arrest, it must be established how much time elapsed between the arrest and the canine sniff. As the court has already found, Agents Figueroa and Rosa were first contacted around 6:40 to 6:50 pm, it took between two to four minutes between that and the intervention, and defendant took approximately a minute to comply with the officers' orders. There was no testimony as to how much time elapsed between ordering the defendant out and the defendant being told he was under arrest.

Inspector Oliver testified that he arrived at the scene of the intervention around 7:40 pm and defendant was in the police vehicle. He testified that immediately upon arriving and learning about the situation, he phoned to have a canine brought to the scene. According to Agent Feliciano of the canine unit, he arrived at the scene around 8:10 or 8:15 pm. He spoke to Inspector Oliver, proceeded to take the canine around the vehicle, and the canine alerted. Thus, the total amount of time between the first invention with the Tundra and the canine alert was approximately an hour and a half.

During this time, however, there were no intervening circumstances to distinguish the search from the arrest. Specifically, defense counsel asked Inspector Oliver if, before calling the canine unit, he had received "any information of the Tundra receiving any weapons?" Hr'g, Nov. 13, at 9:48 AM. Inspector Oliver answered in the negative. Defense counsel further clarified, by asking, "So you had no knowledge of if their could have been any weapons inside the vehicle, because according to the information, what you knew was that the Tundra had given some weapons to another car, is that correct?" Id. at 9:49 AM. Inspector Oliver responded, "Correct." Id.

As to the third prong, the court finds no bad faith on the part of the officers. The test for attenuation, however, does not rest on a single factor, but rather on the balance of factors. The balance here weighs in favor of suppression. Nothing from the testimony indicates that there was a separation of this event from the unlawful arrest, which was still continuing.

Similarly, the court cannot find that the canine alert falls under the inevitable discovery or independent source doctrine exception. No testimony was presented regarding any investigative techniques the officers would have used had they not arrested defendant. This is particularly problematic with respect to the first two prongs of an inevitable discovery analysis.

33

There is no evidence that would allow the court to determine whether those investigative techniques are either truly independent or truly inevitable. Because the canine alert does not fall into any of the exceptions that would purge it of the taint of the unlawful arrest, the subsequent search warrant must be evaluated without this evidence.

ii.   The search warrant affidavit does not support a finding of probable cause when excised of tainted evidence.

"When reviewing affidavits containing 'tainted' evidence, courts regularly set aside the tainted information and then determine if 'there remains sufficient content in the warrant affidavit to support a finding of probable cause.'" United States v. Ford, 22 F.3d 374, 379 (1st Cir. 1994) (applying this methodology to a search warrant that included observations from a prior unlawful search). Removing the references to the canine, the affidavit reads as follows:

> The 6th day of May of 2015, at about 7:00 P.M., I received a call from Agt. Francisco Cortes, badge 21795, indicating to me that he had received a call from [Agent Sanabria] wherein she indicated to him that at 6:55 P.M. she received an anonymous call informing that a Toyota Tundra, white-colored, had transferred some objects to a motor vehicle brand Hyundai, color grey. That after this information some detonations were heard. That this had been at Estancias de Juncos, Tite Curet Street, in Juncos. That thereafter [Agent Sanabria] had received another anonymous call indicating that the white-colored Toyota Tundra had run-over a person after the detonations. That the Toyota Tundra vehicle, had been stopped on road 189, in front of the Ralphs Supermarket in Juncos, by [Agent Rosa]. That the driver of said vehicle's name turned out to be Mr. José Centeno-González. Mr. José Centeno-González indicated to Municipal Policeman Rosa that they couldn't inspect his vehicle without a Judicial Order. [Excised Portion] They proceeded to seal the vehicle and photograph it. The photos were taken by Agt. Luis Montañez-Vadillo, badge 19467. The Toyota Tundra vehicle was transported by a Police of Puerto Rico platform tow truck, Caguas area, by Agt. Luis Rodríguez, badge 17765, in unit GE-00765, to the Caguas Command Center. The case was consulted with Prosecutor Gabriel O. Redondo who directed that a Search Warrant be requested.

ECF No. 52-1.

As discussed in relation to the de facto arrest, the crimes for which the government alleged probable cause existed are illegally transferring firearms, openly displaying firearms,

unlawful possession of a firearm, vehicular battery, or accessory to the shooting death. The search warrant, however, is even more devoid of probable cause than the on-scene arrest. First, the search warrant does not mention the transferred weapons, rather it only states that "some objects" were passed from the Tundra to a grey vehicle. This eliminates the illegal transfer and open display of firearms as bases for probable cause. Second, the search warrant does not link either the Tundra or the grey vehicle to the shooting, but rather indicates that after the objects were passed, "some detonations were heard." This significantly weakens the already tenuous argument that anyone in a white Toyota Tundra was an accessory to murder.  Third, the search warrant merely states that another anonymous call indicated that the white Toyota Tundra had run-over a person after the detonations. Other than both calls referencing the same vehicle, this does not give the finder any basis to determine the credibility of the anonymous call, nor does it contain the few factors that could have limited the scope of the tip more specifically to defendant's Tundra. The affidavit does not mention the tinted windows, that the driver was a man, or that the anonymous call indicated the specific direction in which the Tundra would be driving. Further, even if the information was sufficient to provide probable cause that defendant's Tundra "had run-over a person," there is no information given to show why this probable cause would justify a search of the interior of the vehicle. Finally, the government argued that probable cause to believe defendant unlawfully possessed a firearm was based on a combination of the transfer of firearms, the detonations, and defendant's failure to comply with officers' instructions. The first basis is completely missing from the warrant, which removes the context that might link the defendant and the detonations. Defendant's failure to immediately comply with an officer's order alone is patently insufficient to establish probable cause that he

was in unlawful possession of a firearm. Thus, when excised of the tainted evidence, the search warrant is not supported by probable cause.

> iii. <u>Without the canine alert or the search warrant, there is not probable cause to support a search under the automobile exception.</u>

Absent a lawful arrest, the canine alert, or the search warrant, the other means through which the search of the vehicle may be justified is the automobile exception. This exception allows the search of a vehicle when there is probable cause to believe that it contains articles that the officers are entitled to seize. <u>Chambers v. Maroney</u>, 399 U.S. 42, 48 (1970). "The standard is satisfied when the totality of the circumstances create 'a fair probability that ... evidence of a crime will be found in a particular place.'" <u>United States v. Silva</u>, 742 F.3d 1, 7 (1st Cir.) <u>cert. denied,</u> 134 S. Ct. 2718, 189 L. Ed. 2d 756 (2014). Unlike the focus on the individual in the probable cause to arrest analysis, the focus here is on the vehicle to be searched. "[S]o long as reasonable in scope," searched under this exception "need not be conducted contemporaneously with the seizure or at the seizure site." <u>United States v. Panitz</u>, 907 F.2d 1267, 1272 (1st Cir. 1990) (internal citations omitted).

According to Agent Sanabria the first caller indicated that, in Estancias de la Ceiba, someone transferred weapons from a white Toyota Tundra with tinted windows to a grey vehicle, the grey vehicle drove down the street, and its occupants entered a house and began shooting. A second caller described a white Tundra that ran someone over, then drove off in the direction of Juncos. Officers travelling from Juncos towards Estancias de la Ceiba encountered a white Tundra with tinted windows. When the officers ordered the driver to turn off the engine and roll down his window, the driver did not immediately comply. Agent Calderón went to his vehicle, made the same demand over the loud speaker, and the driver rolled down his window halfway. The defendant then exited the vehicle after being ordered to do so. At some point the

driver indicated that he had been coming from Estancias de la Ceiba, but that he had been there looking for houses to rent. Agent Figueroa described the driver as "nervous and sweaty." Hr'g, Nov. 10, at 11:05 AM.  The defendant was otherwise compliant. There was no evidence that he attempted to flee or resist arrest, rather he promptly lay on the ground when asked.

        Even assuming this vehicle was the Tundra described in the anonymous calls, it is not clear what evidence or contraband it would be reasonable to think the Tundra contained. The officers had, at most, an inkling that the driver might have unlawfully possessed a firearm that could be found within the Tundra or that any evidence of the shooting or the hit and run might be inside the vehicle.

        The government argues that the canine alert provided probable cause under the automobile exception. ECF No. 44, at 9. The court has already found that this alert was tainted by the earlier unlawful search. Even if it were not tainted, much of the government's precedent is inapplicable. The government cited United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007) and United States v. Moore, 795 F.3d 1224, 1231 (10th Cir. 2015) for the proposition that the alert of a reliable canine provides probable cause to search. Both those cases and the recent Supreme Court case that held the same, Florida v. Harris, 133 S.Ct. 1050 (2013), address the use of drug-detecting canines. These canines are trained to detect things that citizens have no lawful right to possess. See United States v. Place, 462 U.S. 696, 707 (1983) ("the sniff discloses only the presence or absence of narcotics, a contraband item"). Thus, officers are entitled to seize anything on which a narcotics canine is trained to alert. At least in Puerto Rico, however, firearms are not per se contraband. Although defendant, as a convicted felon, is not permitted to possess a firearm, there is no evidence that he told anyone this or that anyone ran a check to determine if defendant had a criminal record even though, according to Agent Calderón,

defendant's drivers' license was obtained once defendant was in the patrol car. Further, there is no evidence that any of the officers used the drivers' license information to check if defendant had a license to carry a firearm or if, on the other hand, he was a drug user, illegal alien, or other person prohibited from possessing a firearm. Thus, because the officers did not have probable cause to search the vehicle either before or after the canine alert, the search here cannot fall under the automobile exception. Therefore, the evidence seized from within the car was fruit of the unlawful arrest and should be suppressed.

### C. Even if the arrest was supported by probable cause, the vehicle search was unlawful.

Even assuming the arrest was lawful, the vehicle searches were not justified. Although there was a search warrant authorizing the search of the vehicle, the affidavit is predicated upon an earlier, unlawful search, the canine sniff.

The Supreme Court, in holding that the use of a narcotics-detecting canine was not a search for Fourth Amendment purposes, stated that "the canine sniff is *sui generis*." Place, 462 U.S. at 707. Their reasoning was twofold. First, such a sniff "does not expose noncontraband items that otherwise would remain hidden from public view . . . ." Id. Second, "the sniff discloses only the presence or absence of narcotics, a contraband item." Id. Similarly, a firearms detecting canine does not "expose" concealed items; however, it does disclose the presence of items that citizens may have a lawful right to possess. Under this "contraband-specific" analysis, "a gun detector might qualify as a no-search investigative technique if and only if the concealed possession of a gun is criminal under the circumstances. Use of the detector thus would not be a search when used in certain special settings where there is a general prohibition on carrying a weapon . . . , but would be a search if used more generally *unless* it is true, subject perhaps to very limited exceptions, that carrying a concealed weapon is otherwise a criminal offense." 1

Wayne R. LaFave, Search & Seizure § 2.2(d) (5th ed.). Thus, the court must first address whether any exception to the warrant requirement allowed the use of a firearm-detecting canine.

Assuming the arrest was lawful, there are three general exceptions that this sniff search could fall under. First, the passenger compartment can be searched incident to the lawful arrest of an occupant when the arrestee is both unsecured and within reaching distance of the compartment at the time of the search. See Arizona v. Gant, 556 U.S. 332, 351 (2009). Second, a vehicle may be searched following the arrest of the occupant when it is reasonable to believe that evidence related to the crime of arrest is within. See id. Both of the preceding exceptions, however, are limited to the area within an arrestee's immediate control. See id. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id. at 339. Third, as previously noted, the automobile exception permits a search of a vehicle—even the sealing and transportation of the same—upon probable cause to believe that the vehicle contains articles that the officers are entitled to seize. See Chambers, 399 U.S. at 48; Pantiz, 907 F.2d at 1272.

Setting aside the difficulty under the second test of determining what the crime of arrest was, the search here was neither limited in scope nor supported by probable cause. Agent Feliciano testified that he began "by taking out the canine," then had "him search from the rear of the pickup, of the Toyota," until "the canine alert[ed] me to the right hand side passenger door to the front." Hr'g, Nov. 13, at 10:24 AM. The Toyota Tundra at issue here is a pickup truck, with a cab in the front, containing two rows of seats, and the back of the truck is a flatbed portion. Ex. H. The defendant could, at some point, conceivably have reached anywhere in the cab, but the driver would not have had access to the flatbed portion. Because Agent Feliciano

testified that the canine began at the "rear of the pickup," the use of the canine actually began in a place where the driver could not have reached at the time of arrest. Additionally, at the time of the search, defendant was neither unsecured nor within reaching distance of the truck. Defendant was in the back of a patrol car and was removed only for the purpose of observing the canine sniff.

Under the third test there must be probable cause to believe that the Tundra contained firearms as that is what the canine search was intended to reveal. The first call reported that someone from a white Tundra transferred weapons to a grey vehicle, the occupants of which entered a home down the street and began shooting. There was no testimony, however, that guns were transferred into the white Tundra. Inspector Oliver confirmed that when he called the canine unit, he had no indication that weapons had been transferred to the Tundra. Furthermore, there was no testimony that the firearm canine could detect any sort of residue that would indicate that firearms had recently been inside the Tundra.

The test is that the officers have probable cause to believe that the vehicle contains something they are entitled to seize. Even if there was reason to think that the Tundra contained firearms, there was no evidence that the officers knew at the time of the search that defendant could not lawfully possess firearms. Agent Calderón confirmed that, as far as he knew, no one at the scene of the intervention checked to see if defendant had a criminal record. Further, as far as Agent Calderón knew, no one knew if defendant had a permit to carry a weapon. There was no testimony that the officers believed defendant was a drug user, illegal alien, or for any other reason prohibited from possessing a firearm. Thus the automobile exception cannot provide the basis for the canine sniff. Therefore, even if there was probable cause to arrest the defendant, the

search of the vehicle was unlawful, and the motion to suppress with respect to the tangible evidence found within should be granted.

## V.      Conclusion

For all the foregoing reasons, the motion to suppress, (ECF No. 39), should be denied in part, with regard to defendant's statements addressed above, and granted in part, and all tangible evidence gained following the unlawful arrest of defendant be suppressed. The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to object within the specified time waives the right to appeal this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150–51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 31st day of December, 2015.

s/ Marcos E. López
United States Magistrate Judge